Next case. Raven v. NASDAQ May I please the court, Lawrence Stoich of Berger Montague on behalf of the plaintiff Raven and the class, I ask for three minutes of rebuttal. Granted. We are appealing dismissal of Raven's complaint that addresses predatory trading that manipulated the options market to capture dividends. Does market makers made over 300,000 coordinated trades from 2010 to 2015 result in over $200 million being taken from public investors? Your opening lines talk about manipulative trading practice, use the word manipulative. That word has meaning, doesn't it connect a deceptive act and if you agree with that, what act was deceptive by the trading practices? What was deceptive here was that these traders got together routinely and almost on a daily basis, looked at the stocks that would be ex-dividend and coordinated huge trades together on an almost daily basis. Even though the lower court thought, well, since they- How is that deceptive? Well, it's deceptive in that it's not disclosed to anybody publicly. I mean, they do put up the trades, but in any kind of manipulative scheme, you obviously have to report the trades, otherwise you have no scheme at all. These trades were reported, right? These trades were reported, as would be insider trading trades, they all get reported. The question is, nobody disclosed, neither the exchange nor these traders who had special privileges on the exchange that allowed them to do this manipulative scheme. Nobody disclosed to the average investor that such a scheme was routinely going on. But what was withheld, though? Their activity, unlike an insider trading situation, there's something not known to the public, some kind of communication between the tipper and the tippy, and that's held back. But in this instance, all the transaction activity was out there. I did not see any allegation in the complaint that suggested something was withheld in some way or not available to be known. So that's why I'm not seeing the deception. Well, the trades are known, but not this scheme, which shockingly would surprise any investor who thought he was just putting up his options trades with a potential right for him to recover. Even though it may smell bad, the rules permitted it, didn't they? The rules did not permit it. For instance, first of all, it's a securities law violation. These matched trades are a type of trading which has been historically understood as a manipulative device, going all the way back to Supreme Court precedent, like Santa Fe. These matched there is synonymous with wash? They're very similar. Didn't the district court judge deal with that, though, and explain why these weren't wash trades, why these were different? And why was he incorrect in his explanation? Well, I think what he overlooked here was he viewed the trades as, since they were disclosed, and he also viewed the fact that he thought Mr. Raven actually could do the same thing that these privileged market makers could do. But that was incorrect. That was misunderstood by the court, that only somebody with the privileges of not having their trade netted out, and the fact that they had huge credit. And they had these privileges because they were members, correct? That's correct. Well, doesn't that commercial have taught us for many years that membership has its privileges? I mean, right? Well, that's what you get for being a member. You have the right to do this, and more importantly, you have the money to do it. Was this a case of Mr. Raven just not being able to do this because he didn't have the same resources at his disposal? And if that's the case, is that a violation of securities laws? Well, when you say they have privileges, these market makers, what they were supposed to do, which is defined in the Phillips rules themselves, are to make a liquid market. These trades had nothing to do with making a liquid market. These were just trades between the market makers themselves. They weren't interacting with the public, which is supposed to be what they were supposed to be doing. And in fact, rule 782 of the Phillips rules expressly bars this kind of behavior, these matched trades. But if you start going down the line of whether or not this is in compliance with the rules, don't you walk into whether or not you belong in federal court? No, because that simply is the basis for determining that the securities laws were violated, which they were in this case. And just to cycle back to this question of what's deceptive here. Now, there's a rule 1029, which is in the supplemental appendix that was submitted by Keystone. And actually, that's a document where the exchange and the traders are supposed to make sure any options investor or any public person gets that document. Now, if you look at that document, there's nothing about this dividend play that's been going on for years. You're making an allegation. First of all, what document are you talking about? What document are you talking about? It's a Phillips rule. No, I know. The 1029. You said they have to make a disclosure of some document. I'm sorry. They have to make a disclosure that such trading was routinely going on and that it was an exchange investor like Mr. Rabin that your possibility of the term called skating in the industry, that your possibility of skating has really evaporated due to this insider conspiracy that had been going on for many years. Well, I know that your opponents make much of the fact that the rules allow this. I understand from your answer to Judge Roth. And I think in your papers, you dispute that. I wonder, is it relevant at all? I mean, so what? If they violated a rule, that doesn't give you a stronger private right of action, does it? We would say it does. What support do you have for that? What support would you have for that, that a violation of the exchange's rules would enhance your private right of action? Well, these rules emanate from the underlying securities laws themselves, which obviously under Section 10b, Rule 10b-5, these are prohibited practices to create a deceptive, manipulative scheme is really at the heart of the securities laws. And in fact, one of the goals from the outset of the securities laws is to preserve the integrity of the markets. That's what this case is really about. Perfect. That's where I'd like to go next. You talk about your theory of reliance. You don't argue actual reliance. You don't allege actual reliance in the complaint. Correct? Correct. Okay. So you're working off a presumption of reliance. Correct. And my understanding is that it's basically you just said that the market participants rely on the integrity of the market. You're aware of our Malik decision? Yes. Malik was a fraud on, fraud created the market case, but there is strong language in there that suggests the kind of theory you are proposing would not be something that would be given a presumption because everybody then could have, could just rely on the so-called integrity of the market as their element of reliance and bring their claim under the securities exchange act. Would you, how do you get around Malik? Okay. Malik is a distinctive issue because that concerns new stock issuances being made and whether the underlying stock is so fraudulent that it creates the market. We're arguing there are two bases for reliance here. One would be under affiliated yield that these traders in the exchange had a duty to disclose, which they did not do. Okay. Give me your legal authority for the duty that these member defendants had to your client. What is your legal basis to say they owed you a duty to disclose? Well, you're at, sorry to say that argument's waived, but we'll put that aside for the moment. Tell me where that duty emanates from. Okay. Well, there's a line of cases that we cited, IPO and UBS auction securities that look at these circumstances where you have a narrow market that's supposed to be a bona fide market that, and it's manipulated. That creates the duty itself to disclose to the investors. And there's a line of cases that have followed that reasoning, mutual funds, IPO, UBS auction securities. Now it's the narrow, Malik's concern that this would make things too broad is inapplicable here because we're only talking about these circumstances very unique of a market that somehow is now becoming manipulated. That is, like in the IPO market case, the people that controlled that market had manipulated it. Similarly, mutual funds, those that had access to mutual funds manipulated those securities. This is the same situation here. It's a narrow market. It's just the options. And these key players who are insiders managed to manipulate it. So that's one basis. Affiliated duty is a basis for lines. The second basis would be following the Second Circuit's practice of allowing reliance based upon the assumption that there's a bona fide market free of manipulation. That follows their cases such as Fisani and ATSI. Now the Second Circuit obviously sees a lot of market manipulation cases because it's where the New York Stock Exchange resides and other exchanges. So that circuit has evolved the law to identify this specific circumstance. Let's just go back to the duty. So if I understand you correctly, based upon the cases you have identified, IPO and some of the others, you're claiming that one who is a manipulator has an obligation to disclose their manipulative activity. Yes. In the context of a market that they would have control over. And that's why it keeps it a narrow focus and it's not the concern, the purported concern that it's just going to swallow reliance. But these are a narrow special circumstance here. I thought that might be the answer. And I keep wondering. I think Judge Schwartz's initial question was identify the duty. And I thought your answer seemed a little circular, which was, well, once you engage in manipulative behavior, you have a duty to inform people that you did it. But that didn't answer the question of where's the duty to begin with. You have to violate the duty. Well, the duty arises in this specific circumstance because the traders have a special privilege. And that privilege is tied into the rules of the exchange, which include their obligation to make sure the trading is done in a fair and reasonable fashion in order to provide liquidity and keep the market honest. So they have a special privilege and from that emanates their duty, which they violated here. And therefore, that triggers under Affiliated Youth, their obligation to disclose to the relevant investors. Again, that's one of the two bases for reliance, in addition to looking to the Second Circuit standard,  So, please, the Court, I can continue with why the Court erred on Sienter. Actually, the District Court on its treatment of Sienter, actually concluded that the allegations of Sienter were equally plausible to a contra interpretation. And actually, that's the standard under TELWAPS, that if it's an equally plausible basis to argue Sienter, then it's upheld, which it should have been in this case. Is the volume of trades Sienter? I'm sorry, could you repeat that? Is the volume of trades Sienter? The volume of trades certainly helps inform one that Sienter is here, that this was nearly a daily occurrence, over 300,000 coordinated trades, involving hundreds of millions of options and billions of shares, on a routine basis, and we presented that, we put that as evidence into the record of who traded exact amounts, and we got that directly from Felix's own records. So, did you specify specific trades? Well, we specified the matrix of trades among the conspirators, that there were 12 that we initially named in our complaint, and we showed how many made each trade with each other. And then we also specified for Mr. Rabin, his trades in Pfizer, who had the offsetting trade by the defendants, that pulled away the possibility of Mr. Rabin skating on his. So, we gave those specifics as well. On that point, when you talked about his specific trading activity, your client's trading activity, you gave some number about the value, what I understood to be the value of the option, once this other activity was going on. Is that your damage calculation? Did you put that in there for the purposes of damages? Why would that allegation be? The damage in this case would really be what's the wrongful profit taken by the market makers in their scheme. And it would not only be what you could have gotten as the dividend, had you had the opportunity to hold the stock? Yes. On a class-wide basis, what the class should have had an opportunity to receive the dividends, which instead were vacuumed away by the behavior of the market maker defendants here. So, what was the point of the other allegations about this? John, what's the sense? It is an arcane field. So, we were trying to be as clear as we could what happened. And so, I think what we were trying to do is show, if there wasn't a manipulation, there was a certain probability that the investors would... Would have escaped. I got it. When you add in the huge volume, then the probability went to almost nothing. I understand. And that was a consistent pattern. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Good morning and please the court. My name is Steven Kastenberg. I am here on behalf of the Exchange Defendant Appellees. And I will be addressing the question of immunity. My colleague, David Bowen, will be addressing the securities issues next. I have five minutes. I believe the court has approved that. We have. And I'm glad to know you're talking about immunity. Because I'd like you to explain how the Fee Setting Act constitutes a regulatory act. And I'm prefacing my question by assuming that our court would recognize the existence of SRO immunity. It's been recognized elsewhere. Okay. So just assume that for the purpose of this question? Sure. How is this conduct within the scope of that immunity? So I would address that two ways, Your Honor. First, I would say, before you even reach that question, and I do believe that the Fee Setting is a regulatory act within the regulatory sphere. But before you even reach that, the entire grovelment of the complaint here is that the Exchange failed to police its member defendants. There's allegations in the complaint that the Exchange adopted the fee cap, which, according to the complaint, enabled the dividend play strategy. It would not have been economically feasible but for the fee cap in the schedule. At the same time, the complaint outlines a whole series of FLEX rules, SEC rules and regulations, and Exchange Act provisions that are violated, all of which the Exchange has a regulatory duty to enforce, including its own rules. So as the NYSE specialist case, where New York Stock Exchange was accused, essentially, of conspiring with its members, as the allegation is here, to benefit some members over others. It's the exact same allegation here, that somehow the Exchange has conspired with its members to benefit certain members over other traders. So you don't even have to, my point is, the entire, the focus of the complaint is that we have failed to enforce the Exchange Act and have a fair and open market. And we should be immune under that alone. Now, I do believe that this adding fee is also regulatory in nature. How so? First of all, if you look at what are the regulatory duties of the Exchange, the first thing you look at is the Exchange Act. And the core set of issues, the core set of regulatory responsibilities that NASDAQ and the FedEx Exchange have to comply with is under 6b-5. And there's a list of enumerated obligations, and they include things like fair and orderly markets, fraud, preventing fraudulent manipulative acts. And then one of those items is specifically the equitable allocation of reasonable dues, fees, and other charges. But that's it. We're talking about Section 78F. Yes. I see we're the same. Yes, that's the same. But if you look at that section, it talks about the Commission, being the SEC, allowing the setting of fees and approving what those fees are. How is that a regulatory act by the SEC? The whole theory, the way I understand it, is if the SROs are going to be delegated some authority or responsibility to govern what happens on the exchanges, as the Commission would be able to do, they each get protected by that same behavior. In this instance, how do you say that the fee setting is something the Commission itself would have ever done? It doesn't collect fees. It regulates equal discipline. I'm trying to find an album, right? Both the SROs will discipline and the Commission disciplines. The SROs set fees and collect fees, but the Commission doesn't. Well, under the scheme that's set up by the Exchange Act, the exchanges operate exchanges and regulate the exchanges on their members. That includes things like suspended trading in stocks. It includes stopping trading across all stocks. It includes things like breaking trades, all of which have been the subject of immunity cases, and that conduct has been found to be immune. It also includes the setting of rules that tell traders how they can trade on the exchange, and fee cap is an example of that rule. When the fee cap rule was filed, there were seven different amendments to the fee cap rule during the relevant period, and each one of them, the exchange had to identify what the basis of the rule was under the Exchange Act, and what they said was they believed it enhanced the liquidity of trading, and therefore improved the quality of trading on the exchange. That was a fair and equitable allocation of fees and dues amongst the members as well. If the plaintiffs could demonstrate that the fee caps, in fact, were for the benefit of the members themselves without any benefit at all, or even perhaps having a detriment for the general public, is that covered by any immune regulatory activity? I think absolutely it is. The whole point of the regulatory immunity is that when an SRO takes these actions, they are inevitably going to be favoring some and not favoring others, and those might be members, there might be issuers. If they're favoring themselves, isn't that a different category? Every single case that has applied the immunity and described the immunity talks about the fact that you can't look at intent, because all of these rules, some of them do increase trading volume, which can increase fees, there could be profit motives. Before the exchange was a for-profit public, it was a member-owned collective, and the owners were the members themselves. There are always these incentives, but the exchanges operate under the very close supervision of the SEC, which is the right to suspend officers, to suspend the exchange's registration, to go in court, to abrogate any rule including this fee cap. The point of the fee cap is the plaintiffs aren't coming in and saying, this was $2 too high. The point is they are saying that this fee cap emitted a certain kind of trading, and that trading, when you look at the exchange's filing with the SEC, it's not the fact of filing that makes it regulatory. It's regulatory because it is regulating the behavior of the members and the exchange, and the kind of trading that can occur. And when you look at the exchange's filing, it said, this will allow dividend trading. I mean, it is specifically recognizing to the filing with the SEC, that the fee cap is enabling, and it's finding in its regulatory judgment, this is a good thing under the Exchange Act, because it will increase liquidity, which improves the quality of trading on the exchanges. So it is a quintessentially regulatory decision. Improves the quality of everyone trading on the exchanges, in this particular case. But Your Honor, that is absolutely not standard. That is where the regulatory judgment comes in, as to whether this is a good thing to be doing or not. And then the SEC gets to abrogate or modify or do whatever it wishes to do. And I will say just that even when the OCC, in late 2014, changed its rules, all that did was curtail and limit dividend play strategies. It did not eliminate it. And the OCC filing, and the SEC's order approving that filing, specifically note that. So even today, the SEC has acknowledged, as they have consistently in the past, that dividend play strategies exist, and the SEC is fine with it. And whether one member or one trading person is at advantage or disadvantage is not the question as to whether the issue falls within the regulatory ambit. Those are the exact regulatory judgment making that the exchange is required to make. But what regulatory function does the fee cap play? The fee cap allows dividend trading strategies. And the regulatory function is it is describing the kind of trading that can happen on the exchange. What type of trading is permissible and what type of trading is not permissible. The fee cap does that? That is what the filing itself says. That is what the plaintiff says. No, I know what the obligations are. I'm asking because there's a statute that allows for fee setting. What regulatory function does it play when the exchange sets the rate? The closest analogy we could think of was tolls on the highway. It's your entree to play. It regulates the conduct of the traders. I'm focused on this particular fee, but when you talk about fees in general, and I don't know that you have to address fees in general as opposed to this particular fee, but yes, fees in general, they alter the conduct of traders. They make things feasible. They make things likely. They permit certain kinds of trades. They don't permit certain kinds of trades. They encourage certain volume trading. And by doing that, they are regulating the kind of trading that is occurring on the exchange. I think this is a particularly clear example of that, an easy example of that because of the cap in nature. And the fact that everyone agrees that this enabled this kind of trading strategy. Would an individual investor have to pay the fee to kind of spring up what Judge Roth was asking about is this particular fee cap benefited a particular group of traders? Are there other fees that an individual investor like Mr. Rabin would have had to pay? I don't believe there's anything about this fee in particular that disadvantages Mr. Rabin. Mr. Rabin is complaining that because market makers have certain obligations and certain privileges as market makers, that they were able to take advantage of those with respect to when their trades would be offset against each other to their advantage, not the fee cap. Isn't he also saying that they are paying a lower fee than an investor like Mr. Rabin is paying? They are paying a much lower fee. They have an unlimited or greater ability to carry things on margin so that they can make huge trades that he couldn't make because one, the fees for him would be higher and because two, he doesn't have access to a margin that they have. He is absolutely making that allegation, Your Honor. It is true that market makers as a general rule have different margin requirements that are more permissive of them. And that goes way beyond the allegations in this particular lawsuit as far as the breadth of that. Market makers and specialists, registered options traders, they play a certain function on this exchange and on all exchanges. But here he is saying this is a specific instance where these privileges are being used by members who have a duty to the market to line their own pockets. Now, shouldn't we pay a little attention to that? This gets to me, Your Honor, as to exactly why the immunity exists because these are extremely complicated questions of the management of the capital markets. And you can't criticize them for it. You can criticize. You can criticize, but it's not going to accomplish anything. Mr. Raven can criticize. He can go to the SEC. He never went to the SEC, never asked the SEC to abrogate any one of these rule changes. He could have done that. He could do it today. Any person who has the right to petition the SEC to make a rule change, to abrogate a rule change, he has recourse with respect to the rules. But the point is these are very complex, interdependent decisions. I couldn't begin to explain full ramifications of them. But that's why there is a regulatory immunity, to allow for the regulatory judgment under the close supervision of the SEC. Thank you, Your Honor. Thank you very much. We'll hear from the member defendants. May it please the Court. My name is David Bowen. I'm with the law firm Kattenmuech and Rosenman. I represent three of the member defendants in the case, Largo Trading, Bedrock Trading, and First Derivative Traders. But I speak this morning on behalf of all the member defendants. And I'm joined at council table by Mr. Richard Sheff from the Montgomery McCracken firm, who represents another two L Trading and TSR associates. The Supreme Court held more than 40 years ago, in Ernst and Ernst against Hockfelder, that manipulation in securities cases connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities. Quoting that language more than 15 years ago, this Court held in GFL Advantage against Colquitt, that a private action for market manipulation under Section 10b, is one that requires the injection of false information into the marketplace, or the creation of a false impression of supply and demand, again, for the purpose of artificially inflating or depressing the price of a security. So if we didn't have that second piece for the purpose of language, could one argue that this trading back and forth to make it look like there's all these real option contracts, when we only have a limited number of securities that would be sellable or subject to the dividend date at the time, create this impression that more activity was going on than it actually was? Your Honor, first, those were real option contracts. If they weren't real option contracts, then there would be no purpose to the strategy. They actually bought call options, which they then exercised. They actually sold call options to hold, to hedge their long call option position. So let me just begin to answer. But if all of the options that could have been exercised on a particular day were actually exercised, was there enough stock to satisfy all those calls? Your Honor, this is not a case of a squeeze. If all of the call options were exercised against all of the short options, none of these options traders would realize a dividend. The dividend comes into place only because some long call option holders, when their call options go in the money, out of inadvertence or maybe because they can't afford to buy the stock, don't exercise their call options. Some small fraction, right? And as a result, there are certain short option positions that go unexercised. And if you're holding the stock, and if you've exercised call options on 100 option contracts, and you have only a certain number of call options that are called away, then you're able to escape, in the words of the plaintiff. Okay, so let's move to the second component of what you were saying, which is for the purposes of artificially changing the price of the stock. As I understand your position, there was no artificiality of anything. The stock price was set, and that's what its value was at the time, and that's what people got their dividends off of. The answer to the question Your Honor posed initially, do you need the second piece? You actually need the second piece. You have to inject false information into the market, or you have to trade in such a way as to create a misimpression of supply and demand. Otherwise, there is no actionable manipulation. Okay, and isn't there here a misappreciation of supply and demand, of the ability to escape by the injection into this market of this huge number of washed deals? There is no misimpression of supply and demand, Your Honor, because there was genuine demand. My client actually had a demand for those call options. They required them. But because of the huge number of the options created by the members, that the traders like Mr. Raven, their chance of skating got cut down to a much, much smaller percentage than they would have had otherwise. I mean, that's what damages the injury here, how it's being calculated. And isn't this creation of a false impression of the market that they are in a manipulation of that market? No, Your Honor, as a matter of fact, Mr. Raven was not in the market at the time my clients purchased and sold their call options. He entered the market three weeks earlier. He held a long position in the stock, and as he says in his appellate brief on page 28, his hope was that the stock would not rise, so he would sell call options against the stock and earn the premium as those call options then expired. Well, he guessed wrong because the stock did increase in price. His call options came into the money, and his stock was called away. But he made his only investment decision three weeks before any of this trading by any of the market makers. He was not deceived into doing anything. Was he deceived on the percentage chance of skating? No, Your Honor, he was not. When he actually sold his call options, he had no idea whether he was going to skate or not. His call options were either at or only slightly in the money. It's only when they moved deep into the money that he was at risk of having his call options sold away or called away. And if the argument is that, had he known of the speculative possibilities of what might happen three weeks later, had he known that the options wouldn't have traded, then that's exactly the scenario that this Court dealt with in the Malik case.  Only because no one understood that these option market makers could engage in this dividend capture strategy, that's exactly the situation this Court addressed in Malik. But this is, as was pointed out, a very small market. And this is a consistent pattern which has been going on, which doesn't really pertain to just one stock. It pertains to the ability of a trader in the market to have the normal chance of skating as opposed to the minimal chance of skating created by these mass wash transactions that are consistently being made over a period of time. It's this practice, Your Honor. The dividend capture strategy by registered options professionals has been going on for years. Do you agree with the characterization as a wash? No. Wash trades, that's a noted term within SEC parlance. And again, it suggests this improper purpose, which is necessary in order to complete a manipulation violation under Section 10B. But back to Your Honor's question, it's been going on for a long time. It's been the subject of repeated rule filings by this exchange, by all the other options exchanges, and by the OCC. So your conclusion is that since it wasn't a disapproved method of transacting business, it could not be deceptive, manipulative, a violation of the Exchange Act? It wasn't a violation of the Exchange Act, Your Honor, but that it was the subject of repeated rule filings is certainly suggestive of whether or not it injected false information into the marketplace or created a misimpression of supply and demand. I take the position, and we do take the position in our brief, as Your Honor, Judge Pabbard asked, whether you violate an exchange rule or not is relevant to the 10B-5 manipulation analysis only to the extent that the rule violation itself has inherent within it some deceptive or manipulative quality. And in this case, it certainly doesn't. The only cases they cite are, say, the New York Stock Exchange specialist cases. A specialist receives an order from one customer, is under a duty to the extent that he can to cross that order against a reciprocal order from another customer, and instead interposes himself between the two, depriving at least one side of a more advantageous price. In that case, that rule violation can in fact violate Section 10B, and more to the point here, can actually form the basis for a private right of action under Section 10B, where the person, where the specialist is in privy, he is in the market at the time the customer is in the market. He's acting in a way that induces the customer to send the order to him rather than some other exchange, and then he defrauds the customer. And none of that is here. Mr. Raven was in the market weeks before my clients were. He didn't rely on any information that could possibly... When you say your clients, are you speaking for all of the member defendants? I am. For purposes of this argument, I am, Your Honor. So none of the member defendants were participants at all? They're not alleged to have been. When Mr. Raven entered the marketplace, presumably, take the Pfizer options, presumably his orders were routed to the Pfizer option pit. And there is a specialist, presumably, in the Pfizer option pit who's responsible for satisfying customer orders. None of the member defendants is alleged to have transacted with Mr. Raven, much less to have done so as a specialist. I'm talking about simultaneously. At the time that he was involved in his option trades, are you saying that none of the defendants in this case were involved in option trading during that same period with the Pfizer stuff? No, there is no allegation to that effect. These were registered options traders who had the privilege, under the rules of the Philadelphia Stock Exchange, to engage in proprietary transactions, even in options classes in which they held no assignment as a market maker. So within the classes of options in which they had market-making responsibilities, they did have to stand ready, willing, and able to quote, you know, to offer bids and offers to the general public to remedy any imbalances of supply and demand. But doesn't the allegations and the complaints say that at the time that Mr. Raven would have been able to capitalize, had he been able to retain the stock and not have to make good on the option? At that moment, I saw the number, like $288,000 went to the defendants, but didn't go to him. The only investment decision Mr. Raven made was three weeks earlier. My question is a little bit different, though. My question is at the time that all this activity is going on around the ex-dividend date and which stocks were available to satisfy the various option contracts, I understood the allegations to say that the member defendants were participating at the same time in the file of stock, and therefore there was some, you're saying that's a misunderstanding of the complaint. I'm happy to be corrected. I think you're confusing two different things without respect. That's okay. My clients were actually in the market. They were buying and selling options. And were among the options Pfizer options? Yes, they were. At the same time, Mr. Raven was in the market and had option contracts for Pfizer, correct? He was not in the market, Your Honor. He was not in the market? No. He had already sold the right to have his stock called away. And he did it at a price that... Well, he sold the right. Yes. But at the time that all these option contracts were being satisfied... Yes. Before the same ex-dividend date, your clients were having their satisfied, he was having his satisfied, or he had to make good on the stock. The activity was going simultaneously, no? The purchase and sale activity preceded the exercise in the simultaneous... Of course it did. Because that's how the options work, right? But if Your Honor is saying, wait a minute, they were all subject to exercise at the same time, that of course is true. That's why they alleged that there was a diminution in the probability the likelihood that they would be... Right. Because the way you were characterizing your argument was as if your folks were not doing... And I want to see if all the member defendants were doing nothing at all vis-a-vis Pfizer stock at the time the Pfizer stock dividend was paid. And that's not what the allegations are. So I think we're now speaking on the same... We're coming up from the same understanding. That is, when the ex-dividend date hit and dividends were being paid, there was opportunities for both the member defendants and Mr. Raiden to potentially have made money. Exactly right. It's rule-driven, Your Honor. When the exercise notices come in, the OCC, the Options Clearing Corporation, processes them according to some very strict rules that incidentally are approved by the OCC. Okay. Let me see if my colleagues have any other questions. Okay. I have one question for you on the artificiality. The Zanford case? Yes. Your adversary seems to suggest that it's taken away the need to have an artificiality in the price. What is your response to his argument on Zanford? Your Honor, Zanford isn't even a manipulation case, much less a manipulation case in which the Supreme Court, contrary to all of the manipulation precedent, decided to rewrite the rules or redefine the elements of a claim for manipulation. Zanford is a very simple case. A stockbroker took money from a customer, representing that it would invest the customer's money in conservative securities, then in fact sold the portfolio and pocketed the proceeds. It's sort of the quintessential 10-B fraud. Right. And the issue before the Court was whether that activity was sufficiently in connection with the purchase or sale of securities to complete a 10-B-5. It has nothing to do with marketment. I'm not talking about marketment. I'm talking about whether or not it took away. You're saying, therefore, any comments, let me make sure I understand you, because it was a typical 10-B-5 fraud, when it spoke about the issue of artificiality in price, it wasn't speaking about in contact with market manipulation. No, Your Honor. Okay. That remains good law to this day. Okay. Thank you. Thank you. Thank you, Your Honors. A couple of points I want to make. First, I want to make clear that trading that's in dispute of the market makers were no-risk trades. They were completely offset positions. And though they've tried to characterize them now, I think as part of their normal trading activity to maintain the market, that is just not correct. But isn't that what they do? Isn't that what they do? And if there's a violation of the securities laws on these facts, does that then invalidate what all market makers in all exchanges do? Well, market makers are supposed to make a market, that is, trade them in from the public. And they're supposed to make sure that somebody that can respond and trade with those new orders coming in. But that's not what they did here. These were all planned trades just between those insiders who control the market, setting up, I'll sell you 50,000 of the same option, you sell it back to me for 50,000. So they're all matched trades. It's similar to, you know, we say it's hopper, where the parties, you know, match their trades. And it means that that's not really supply and demand. It's sort of phony supply and demand that actually distorts the market. Ultimately, the OCC, when they finally put a stop to this matched trading on the same option, they noted that this improper behavior. And that's why they ultimately had to stop it and change the procedures so that the market makers couldn't continue doing it the way they were doing it. Now, I also want to briefly address immunity. And I think the important question on immunity is, is this a business activity of the exchange when it sets fee cap, which certainly it is. And the case briefs by Weissman and Opulent and the S seat brief that we put in the record here, that plainly says if it's not regulatory, if it's not disciplinary or regulatory, then it's not covered in immunity. And this behavior of setting fee cap was simply a mechanism to maximize trading in this profit-making enterprise, Philips and NASDAQ. And that's why this is not a basis for immunity here. Your adversary characterized his, I think he talked about his gravamen or something like that about the complaint against the exchange defendants as a failure of the exchange defendants to police the member defendants. Is that what your argument is for liability against the exchange defendants? Or is it something more limited? That is, they put in a fee mechanism to allow the behavior to go in. So it's a more narrow one. Yes. Our focus for this scheme is that Philips, its role in the scheme was putting the fee cap on since otherwise it was not an economically feasible scheme to put up all these huge trades. So from your point of view, if we were to reach the immunity issue, if we first determined immunity existed, we would then only be examining whether or not the fee cap was an immune act. Yes. Okay, thank you. I see my time's up. Okay, all right. Thank you for your audience. Thank you very much. Thank you all, counsel, for a well-argued case and for all the briefing in this matter. And we will take the matter under advisement.